IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **CHRISTOPHER M. McLASKEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15-cv-085-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM and ORDER</u>**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Christopher M. McLaskey,
represented by counsel, seeks judicial review of the final agency decision denying
him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI)
benefits pursuant to 42 U.S.C. § 423.

**<u>Procedural History</u>**

Mr. McLaskey applied for benefits in November 2011, alleging disability
beginning on January 27, 2012. (Tr. 12). After holding an evidentiary hearing,
ALJ Michael Hellman denied the application on September 6, 2013. (Tr. 12-26).
The Appeals Council denied review, and the decision of the ALJ became the final
agency decision. (Tr. 1). Administrative remedies have been exhausted and a

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties
pursuant to 28 U.S.C. §636(c). See, Doc. 9.

1

timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The RFC assessment was erroneous because the ALJ did not adequately evaluate plaintiff's credibility and failed to consider the effects of plaintiff's diabetes on his ability to work fulltime.

2. The ALJ erred in his consideration of plaintiff's failure to follow prescribed treatment.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

significant physical or mental activities, and that is done for pay or profit.   20

C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is

presently unemployed; (2) whether the claimant has an impairment or combination

of impairments that is serious; (3) whether the impairments meet or equal one of

the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work

experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th

Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. McLaskey was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

4

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Hellman followed the five-step analytical framework described above. He determined that Mr. McLaskey had not been engaged in substantial gainful activity since the alleged onset date and that he is insured for DIB through March 31, 2016.   He found that plaintiff had severe physical impairments of diabetes mellitus with hypoglycemia, thoracic and cervical spine impairments, and left shoulder impairment.   The ALJ further determined that these impairments do not meet or equal a listed impairment.

The ALJ concluded that Mr. McLaskey had the residual functional capacity (RFC) to perform work at the light exertional level, limited to no climbing of ladders, ropes or scaffolding, only occasional climbing of stairs and ramps, frequent overhead reaching and gross manipulation with the left upper extremity, and no concentrated exposure to moving machinery and unprotected heights. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past work.   However, he was not disabled because he was able to do

other jobs which exist in significant numbers in the regional and national economies.   (Tr. 12-26).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

### 1.    Agency Forms

Plaintiff initially claimed that he became disabled on October 1, 2009.   (Tr. 143).   He later changed the alleged to onset date to January 27, 2012, which is the date on which he stopped working.   (Tr. 219).

Plaintiff was born in 1974 and was 37 years old on the amended alleged date of onset.   (Tr. 235).   He worked as a laborer doing road maintenance from December 2009 to January 30, 2011.   He was a crew leader in a boat building factory from October 1993 through March 2008.   (Tr. 263).

Plaintiff stated in a Function Report that he lived with his daughter.   He did cleaning and laundry, and cooked meals.   He said he did not drive because his diabetes affected his eyesight.   His hobbies were watching television, hunting and fishing.   (Tr. 250-258).   In May 2012, he reported that his eyesight and the circulation in his legs had worsened.   He said he needed help with daily activities and he had to have friends spend the night with him when he was ill.   (Tr. 275-280).

6

## 2.   Evidentiary Hearing

Mr. McLaskey was represented by an attorney at the evidentiary hearing on August 2, 2013.  (Tr. 34).  His daughter was 12 years old.  He shared custody with his ex-wife.  (Tr. 38-40).  He had not worked since January 27, 2012.  (Tr. 41).

Plaintiff testified that he was a "brittle diabetic" and this his blood sugars ranged from very high to very low.  He had blackouts from low blood sugar.  He took Humalog insulin with every meal, and was supposed to eat a small snack between meals.  He also took a long-acting insulin, called Lantus.  He still had trouble controlling his blood sugars.   (Tr. 45-48).

Plaintiff checked his blood sugar 7 or 8 times a day.  During the previous week, his sugars ranged from 24 to over 500.   When his blood sugar was below 50, he got tingling and pain in his legs.   He was supposed to eat a snack and drink juice or milk.  It took about 30 to 40 minutes for his blood sugar to rise, and he was unable to do anything during that time.  He had an episode of low blood sugar every day.   He lost both of his jobs because he blacked out due to low blood sugar. (Tr. 62-65).

Plaintiff also had pain in his neck.   (Tr. 56).

Plaintiff testified that he was unable to hunt or fish anymore because of limitations from diabetes and because of neck problems.   (Tr. 54-55).

Plaintiff became ill during the hearing.   He checked his blood sugar, and it was 25.   (Tr. 71).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question that corresponded to the ultimate RFC findings.   The VE testified that such a person would not be able to do plaintiff's past work.   However, there are other jobs in the regional and national economies which he could do.   Examples of such jobs are small product assembler, routing clerk and hand packager.   (Tr. 73-74).

The VE testified that a worker who was off-task for 15% of the day would not be able to meet daily productivity standards.   (Tr. 76).

### 3.    Medical Records

Mr. McLaskey was diagnosed with Type 1 diabetes some years before his alleged onset of disability.   He was taken to the hospital after having two seizures while hunting in January 2010.   A consultation report described plaintiff's diabetes as "uncontrolled brittle type 1 diabetes."   The doctor also noted that he was having financial difficulties and had not been coming in for follow-up and had difficulty paying for insulin.   (Tr. 368).   The discharge summary, written by Dr. Michelle Jenkins, described plaintiff as "a type 1 diabetic with noncompliance and history of polysubstance abuse."   (Tr. 365).

Mr. McLaskey went to the emergency room following a seizure caused by hypoglycemia (low blood sugar) on December 23, 2011.   The notes indicate he had not eaten dinner that night.   (Tr. 357-361).

Dr. Jenkins and Physician's Assistant Marilyn Starkey saw plaintiff periodically at the REA Clinic in Christopher, Illinois.   He was first seen there for

management of his diabetes in July 2009.   He also complained of neck pain and numbness in his legs.   (Tr. 454).

The alleged date of onset of disability is January 27, 2012.

On February 1, 2012, PA Starkey noted that plaintiff's problems with diabetes were getting worse.   He had a seizure around Christmas and another one on January 25, 2012, but did not go back to the hospital.   His home blood sugar readings ranged from 29 to 391, and he was experiencing blurred vision, burning in his extremities, dyspnea, and hypoglycemic events consisting of shakiness, seizure and syncope.   She described him as "chronically ill-appearing."   She noted an abnormal monofilament exam.   Her assessment was type 1 diabetes, uncontrolled. She recommended that he see an endocrinologist.   (Tr. 442-444).   On February 8, 2012, PA Starkey again diagnosed uncontrolled diabetes along with diabetic neuropathy.   She advised plaintiff not to drive if he was not feeling well.   (Tr. 440-441).

Dr. Ayesha Rather, an endocrinologist, saw plaintiff on February 21, 2012. She noted that he checked his blood sugar levels 3 or 4 times a day and he was hypoglycemic once a day.   He was "frustrated" about his high and low blood sugars.   He did not know how to count carbohydrates on a sliding scale with meals.   His last A1C was a year ago and he had no recent lab work.[3]   He had no

___

[3] "The A1C test is a blood test that provides information about a person's average levels of blood glucose, also called blood sugar, over the past 3 months. The A1C test is sometimes called the hemoglobin A1c, HbA1c, or glycohemoglobin test. The A1C test is the primary test used for diabetes management and diabetes research." http://www.niddk.nih.gov/health-information

9

insurance and was not working.   On exam, Dr. Rather noted that plaintiff's appearance was within normal limits.   Physical exam was normal.   Monofilament exam of the plantar surfaces was within normal limits.   Dr. Rather spent some time educating plaintiff on carb counting and calculating insulin dosages.   She placed him on a basal-bolus regimen.[4]   She wanted to do bloodwork, but plaintiff had no insurance and wanted to wait.   (Tr. 500-502).

Plaintiff saw Dr. Michael Workman at Southern Illinois Medical Services in March 2012 for neck pain.   Dr. Workman told him to continue to see Dr. Rather for his diabetes, and recommended that he not drive or get on roofs or ladders until he had been seizure-free for 6 months.   (Tr. 486-488).

When plaintiff returned to Dr. Rather on March 29, 2012, he reported that he had fewer hypoglycemic events and that his blood sugars ranged from 267 to 450. He had not brought his glucometer in so that his blood sugar history could be reviewed.   Dr. Rather recommended that he have his A1C checked before the next visit.   She noted that he was not sure if he was correctly counting carbs.   Her assessment was type 1 diabetes, uncontrolled.   (Tr. 504-505).

Plaintiff returned to Dr. Rather in June 2012.   He was not taking Novolog (a fast-acting insulin) with meals because he feared hypoglycemia.   The doctor had "an extensive discussion" about the importance of taking Novolog with meals,

---

/health-topics/diagnostic-tests/a1c-test-diabetes/Pages/index.aspx#1, visited on February 2, 2016.

[4] A basal-bolus regimen is an" insulin regimen for diabetic patients in which patients use short- or rapid-acting insulins before each meal (bolus doses) and a long-acting insulin once a day (basal dose)."   http://medical-dictionary.thefreedictionary.com/basal-bolus+insulin+therapy, visited on February 2, 2016.

"otherwise he will be chasing blood sugar all over."   (Tr. 506-507).

In July 2012, Dr. Workman noted that plaintiff had uncontrolled diabetes and had seizures secondary to low blood sugars.   (Tr. 571-573).

Lab work ordered by Dr. Rather was done at Herrin Hospital in August 2012. Plaintiff's A1C was high at 8.5.   (Tr. 549-552).

Mr. McLaskey went to the emergency room on September 9, 2012, with hypoglycemia.   His girlfriend reported that he had woken up with confusion and decreased responsiveness.   He had had several similar episodes since his diabetes medications were changed about 4 to 6 weeks earlier.   He was on Illinois Medicaid. He reported that the type of insulin he had been using had been changed because his insurance would not pay for the medications he had been using.   He said he had not had to use any short-acting insulin since his medications had been changed, and had not taken insulin that morning.   He was given insulin and a meal.   The diagnosis was low blood sugar.   He was instructed to reduce his insulin dosage and to follow up with Dr. Rather.   (Tr. 535-541).

Dr. Rather next saw plaintiff the next day.   He again failed to bring in his blood sugar readings.   He reported that he had been in the emergency room the prior day for low blood sugar.   He had not taken Humalog (fast-acting insulin taken with meals) for 2 and a half weeks.   He had noticed more low blood sugar readings since his insulin was changed.   Dr. Rather wrote that she would change his insulin dosage "since it is difficult for him to count carbs."   She also told him that he could take Humalog after meals to try to decrease hypoglycemia.   Her

assessment was uncontrolled diabetes and "noncompliant."   (Tr. 508-509).

In March 2013, Dr. Workman noted that plaintiff's diabetes was being treated by Dr. Rather, and plaintiff said that he had his "labs and urine checked recently."   (Tr. 564).

Mr. McLaskey did not return to Dr. Rather for 8 months.   In May 2013, Dr. Rather noted that he again failed to bring in his blood sugar readings, and he had not had any lab work done.   She explained that he should follow up with his primary care physician if he was not going to bring in his blood sugar readings or get lab work done.   The assessment was again uncontrolled diabetes and "noncompliant."   He was to return in 4 months.   (Tr. 501-511).

Mr. McLaskey saw Dr. Workman again in June 2013, but there were no notes regarding his diabetes or blood sugar levels.   (Tr. 560-562).

## Analysis

Plaintiff first argues that the RFC assessment was erroneous because the ALJ did not adequately evaluate plaintiff's credibility and failed to properly consider the effects of plaintiff's diabetes.

Turning first to the credibility determination, plaintiff points out that the ALJ used the boilerplate language that has been criticized in cases such as *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), and *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003).   However, the use of the boilerplate language does not necessarily require remand.   The use of such language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence.   See, *Pepper v,*

*Colvin*, 712 F.3d 351, 367-368 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306,

310-311 (7th Cir 2012).

Social Security regulations and Seventh Circuit cases "taken together,

require an ALJ to articulate specific reasons for discounting a claimant's testimony

as being less than credible, and preclude an ALJ from 'merely ignoring' the

testimony or relying solely on a conflict between the objective medical evidence and

the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v.*

*Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.   The

credibility findings of the ALJ are to be accorded deference, particularly in view of

the ALJ's opportunity to observe the witness.   *Powers v. Apfel*, 207 F.3d 431, 435

(7th Cir. 2000).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the

claimant's credibility, including the objective medical evidence, the claimant's daily

activities, medication for the relief of pain, and "any other factors concerning the

individual's functional limitations and restrictions due to pain or other symptoms."

SSR 96-7p, 1996 WL 374186, at *3.   "[D]iscrepancies between objective evidence

and self-reports may suggest symptom exaggeration."   *Getch v. Astrue*, 539 F.3d

473, 483 (7th Cir. 2008).

The ALJ is required to give "specific reasons" for his credibility findings.

*Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).   It is not enough just to

describe the plaintiff's testimony; the ALJ must analyze the evidence.   *Ibid.*   See

also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the

credibility finding with specific reasons supported by the record.")

ALJ Hellman committed several errors in evaluating plaintiff's credibility. First, he relied heavily on the fact that plaintiff did not get prescribed lab work done, did not take insulin as prescribed, and was described as "noncompliant" by Dr. Rather.   According to the ALJ, this demonstrated that plaintiff was exaggerating the severity of his symptoms.

An ALJ may not conclude that a claimant is exaggerating his limitations based on lack of medical treatment or failure to take medication without taking into account the claimant's inability to afford treatment.   *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013), citing SSR 96-7p, 1996 WL 374186, at *7-8. "Inability to pay for medication . . . may excuse failure to pursue treatment."   *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

The Commissioner argues that plaintiff did not testify that he had difficulty affording treatment.   See, Doc. 25, p. 7.   However, the medical records reflect that Mr. McLaskey had no insurance for a period of time, and was then covered by Medicaid.   Dr. Rather's records indicate that plaintiff put off having prescribed lab work done because he had no insurance.   (Tr. 500-502).   Emergency room records reflect that both his long-acting and fast-acting insulin were changed because Medicaid would not pay for the kind he had been using.   (Tr. 535-541). There is no indication in the ALJ's decision that he considered plaintiff's inability to pay for treatment in evaluating his "noncompliance."

In addition, as plaintiff argues, there is no indication that the ALJ took into

14

consideration Mr. McLaskey's apparent difficulty in calculating how much insulin he was supposed to give himself.   Dr. Rather perceived that he had such difficulty, and she spent time going over the protocol and even changed the method of calculating the dosage because of plaintiff's difficulty with counting carbs.   (Tr. 500-502, 506-507, 508-509).   The Commissioner argues that this position is "disingenuous" in view of plaintiff's testimony that he "constantly monitored" his condition.   She also argues that "nothing elicited at the hearing or in the medical record suggested that Plaintiff lacked the cognitive ability to understand how to control his diabetes."   See, Doc. 25, p. 7.   The second assertion is factually incorrect; Dr. Rather repeatedly documented that plaintiff was having difficulty counting carbs and calculating the correct dosage of insulin.   Further, the fact that plaintiff was able to use a glucometer to check his blood sugar level does not mean that he had no difficulty figuring out how much insulin to give himself.   And, contrary to the statement in defendant's brief, plaintiff did not "thoroughly" explain at the hearing how he was supposed to calculate the dosage using a sliding scale. He referred to the fact that he was supposed to take Humalog on a sliding scale, but did not explain how the dose was calculated.   He did specify the dosage he took of long-acting Lantus, but that dosage was not determined on a sliding scale.   (Tr. 48).

In view of Dr. Rather's office notes, the ALJ should not have concluded that plaintiff's noncompliance negatively affected his credibility without also considering plaintiff's apparent difficulty in understanding how he was to calculate the dosage of

fast-acting insulin based on counting the units of carbohydrates consumed.

Lastly, the ALJ viewed plaintiff's failure to quit smoking cigarettes after having been advised to do so by a doctor as further evidence of noncompliance adversely affecting his credibility.   (Tr. 20).   This was error.   The Seventh Circuit has held that, in view of the addicting nature of cigarettes, failure to quit smoking "is an unreliable basis on which to rest a credibility determination."   *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000).

The erroneous credibility determination requires remand.   "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding."   *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).   Here, plaintiff's testimony is not incredible on its face, and it is clear that the decision depended in large part on plaintiff's credibility.

The Court also agrees that the ALJ selectively considered the medical evidence.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it."   *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

Here, the ALJ ignored evidence that supported plaintiff's claim.   He noted normal findings in exams on February 1 and 8, 2012, but failed to note that PA Starkey described him as "chronically ill-appearing" and that monofilament exam

16

was "abnormal" on the first visit.   (Tr. 440, 443-444).   He described Dr. Rather's exams as normal, but failed to note that lab work ordered by her showed a high A1C reading.   (Tr. 549-552).   He expressed skepticism regarding plaintiff's "alleged seizure disorder" without seeming to appreciate that the emergency room records established that plaintiff's seizures were caused by episodes of extremely low blood sugars.   (Tr. 20-21).   And, he incorrectly stated that plaintiff's doctor had not "made any significant changed to the claimant's treatment regimen in light of the allegedly numerous hypoglycemic episodes."   (Tr. 20).   In fact, as described above, Dr. Rather adjusted plaintiff's treatment regimen on almost every visit to try to achieve better control of his fluctuating blood sugar levels.

In view of the ALJ's selective and incorrect review of the medical records, the Court finds that the ALJ failed to build the required "logical bridge" from the evidence to his conclusions as to plaintiff's RFC.   *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. McLaskey was disabled at the relevant time or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Christopher M. McLaskey's

17

application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   February 5, 2016.**

<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**